## S11A1663. NEAL v. THE STATE.

(722 SE2d 765)

CARLEY, Presiding Justice.

A jury found Eugene Neal guilty of the malice murder of his fiancée Dorothy Driskell. The trial court entered judgment of conviction on that guilty verdict and sentenced Neal to life imprisonment. After a motion for new trial was denied, Neal appealed to the Court of Appeals, which transferred the case to this Court.* See *State v. Murray*, 286 Ga. 258 (687 SE2d 790) (2009); *State v. Thornton*, 253 Ga. 524 (1) (322 SE2d 711) (1984).

1. Construed most strongly in support of the verdict, the evidence shows that, in the master bedroom of his house, Neal placed the victim in a chokehold until she passed out. The medical examiner testified that the cause of death was manual strangulation with significant force for at least four minutes. In a statement at the scene and during his testimony, Neal stated that the victim attacked him out of jealousy and bit him and that he was defending himself. However, Neal admitted that he kept the victim in a chokehold until she stopped struggling and that she fell to the floor when he let go. No drugs or alcohol was found in the victim's blood. About 13 years before, Neal choked his then-wife, and there were several other instances of physical abuse by Neal during that marriage.

Neal argues that the evidence was insufficient to prove beyond a reasonable doubt that the cause of the victim's death was any act or omission by Neal instead of the severing of her jugular vein by emergency medical personnel during intubation. However, the testimony shows that the emergency personnel actually punctured the jugular vein while attempting to start an I.V. line and that such a puncture was normal in the circumstances. There is no evidence that the medical treatment by emergency personnel was negligent. Even if it were negligent, it would not normally constitute an intervening cause unless, unlike here, it was a gross mistreatment. Robert E. Cleary, Jr., *Ga. Criminal Offenses and Defenses*, Homicide (I) (D) (2011 ed.). See also *Hendrick v. State*, 257 Ga. 17, 18 (5) (354 SE2d 433) (1987); 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.4 (f) (5) (2d ed.).

Contrary to Neal's summary of the medical examiner's testi-

---

* The crime occurred on August 17, 2006, and the grand jury returned an indictment on March 9, 2007. The jury found Neal guilty on October 31, 2008 and, on that same day, the trial court entered the judgment of conviction and sentence. The motion for new trial was filed on November 6, 2008, amended on October 1, 2010 and December 10, 2010, and denied on February 4, 2011. Neal filed the notice of appeal on February 25, 2011, and the Court of Appeals transferred the case on July 1, 2011. The case was docketed in this Court for the September 2011 term and orally argued on January 24, 2012.

mony, that witness testified that blood in the victim's neck muscles may have come from the punctured vein, but that the blood in her lungs did not. Although the medical examiner did not "think" that the bleeding from that vein contributed to the victim's death, he testified that there was not enough blood from the vein for the victim to bleed to death. Based on the medical examiner's testimony, a rational jury could conclude that Neal's strangulation of the victim either caused or directly and materially contributed to her death and that the emergency treatment was at most a secondary, rather than intervening, cause of death. See *Green v. State*, 266 Ga. 758, 760 (2) (b) (470 SE2d 884) (1996); *Bishop v. State*, 257 Ga. 136, 140 (2) (356 SE2d 503) (1987); *Larkin v. State*, 247 Ga. 586 (1) (278 SE2d 365) (1981). In short, the jury was authorized to reject the theoretical possibility of causation offered by Neal. See *Shields v. State*, 285 Ga. 372, 375 (1) (677 SE2d 100) (2009).

We conclude that the evidence was sufficient to enable a rational jury to find beyond a reasonable doubt that Neal was guilty of murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Neal contends that the trial court erred in admitting, over defense objections, evidence of allegedly similar transactions involving his ex-wife and occurring a decade or more before the victim's death here.

Both the prior transactions and the murder in this case involved violent assaults by Neal against women with whom he was intimately involved.

[T]hey involved acts of violence that were either entirely unprovoked or disproportionate to any provocation. Moreover, "(i)n cases of domestic violence, prior incidents of abuse against family members or sexual partners are more generally permitted because there is a logical connection between violent acts against two different persons with whom the accused had a similar emotional or intimate attachment." [Cit.]

*Hall v. State*, 287 Ga. 755, 757 (2) (699 SE2d 321) (2010). The similar transactions were offered to prove intent, bent of mind, course of conduct, and common scheme or plan. "When similar transaction evidence is admitted for these purposes, a lesser degree of similarity is required than when such evidence is introduced to prove identity. [Cits.]" *Smith v. State*, 273 Ga. 356, 357 (2) (541 SE2d 362) (2001). See also *Abdullah v. State*, 284 Ga. 399, 401 (3) (667 SE2d 584) (2008). Furthermore, the lapses of time of up to 13 years

between the prior incidents and the crime[ ] at issue here do

not require exclusion of the evidence. [Cits.] Given that the similar transaction evidence reflects [Neal's] behavior towards prior spouses, we conclude that any prejudice from the age of these prior incidents was outweighed by the probative value of the evidence under the particular facts of this case and the purpose for which the similar transactions were offered. [Cit.]

*Hall v. State,* supra. Moreover, "[w]e find no merit in [Neal's] contention that the similar transaction evidence was overly prejudicial, as the trial court gave detailed limiting instructions [before] it was admitted and at the close of the case. [Cit.]" *Rivera v. State,* 282 Ga. 355, 359 (3) (647 SE2d 70) (2007).

"Because the evidence was sufficient to establish the required similarity between the charged crime[ ] and the [assaults Neal] inflicted on [his ex-wife], the trial court did not abuse its discretion by admitting this evidence." *Hall v. State,* supra.

3. Immediately after charging the jury on self-defense in the language of OCGA § 16-3-21 (a), the trial court, using the language of subsection (b) (3) almost verbatim, gave the following additional charge:

A person is not justified in using force if that person was the aggressor or was engaged in a combat by agreement, unless the person withdraws from the encounter and effectively communicates his intent to withdraw to the other person, and the other person still continues or threatens to continue the use of unlawful force.

The giving of this charge is enumerated as error on the basis that there was not sufficient evidence that Neal was the first aggressor.

"Where an instruction closely tracks the language of OCGA § 16-3-21 [(a) and (b)], as the charge in this case does, giving that instruction is not harmful, even when the exceptions described by subsection (b) do not apply. [Cit.]" *Reese v. State,* 270 Ga. App. 522, 524 (3) (607 SE2d 165) (2004). See also *Lee v. State,* 265 Ga. 112, 113-114 (3) (a) (454 SE2d 761) (1995); *Jolley v. State,* 254 Ga. 624, 628 (4) (331 SE2d 516) (1985); *Hayles v. State,* 287 Ga. App. 601, 603 (1) (c) (651 SE2d 860) (2007). In the cited cases, the trial court apparently instructed the jury on every exception to self-defense contained in subsection (b), and the defendant contended that either none or only one of them was applicable. In the case now before us, the trial court's instruction encompassed only the third exception in subsection (b) and therefore was more clearly harmless than the charges in the above-cited cases which included all of the exceptions

in subsection (b) and which nevertheless did not constitute reversible error. Assuming that there was no evidence that Neal was the aggressor, the charge on OCGA § 16-3-21 (b) (3) "was at most merely irrelevant, being one of a number of stated exceptions to the rule concerning the use of force in self-defense." *Hill v. State*, 155 Ga. App. 718, 719 (1) (272 SE2d 508) (1980). See also *Lowe v. State*, 267 Ga. 410, 413 (4) (478 SE2d 762) (1996).

Moreover, the trial court not only instructed the jury on self-defense as set forth in subsection (a), it also fully charged on the doctrine of reasonable fears, on the absence of a duty to retreat, and on the State's burden of proving beyond a reasonable doubt that the defendant was not justified.

> The true question is whether an abstractly correct charge not authorized by the evidence is calculated to confuse and mislead the jury. . . . [W]here it is obviously highly probable that the error, if existing, did not contribute to the verdict, a reversal will not result. [Cits.] Taking the charge as a whole we find no reversible error.

*Hill v. State*, supra. See also *Lowe v. State*, supra; *Martin v. State*, 164 Ga. App. 500 (3) (297 SE2d 112) (1982).

4. Neal further contends that his trial counsel rendered ineffective assistance by failing to present readily available testimony by his ex-girlfriend regarding his peaceful history, nature, and character.

> In order to succeed on [his] claim of ineffective assistance, [Neal] must prove both that [his] trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. [Cits.] In reviewing the trial court's decision, " '(w)e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' (Cit.)" [Cit.]

*Smith v. State*, 288 Ga. 348, 352 (8) (703 SE2d 629) (2010).

Neal argues that testimony by his ex-girlfriend would have rebutted the similar transaction evidence which suggested a character for and predisposition to violence by Neal in such relationships. However, " '[w]hether to introduce character evidence and poten-

tially open the door for impeachment is clearly one of tactics and strategy.' [Cit.]" *Smith v. State,* supra at 354 (8) (i). See also *Washington v. State,* 276 Ga. 655, 659 (3) (c) (581 SE2d 518) (2003). Trial counsel testified that testimony regarding Neal's peaceful character would have opened the door to additional adverse character evidence which had been excluded by the trial court, including the testimony of another ex-girlfriend who was present and ready to testify about Neal's bad character. The prior admission of a similar transaction from which the jury may draw certain limited inferences does not make unreasonable defense counsel's strategy to avoid offering testimony of the defendant's nonviolent character which would open the door to additional adverse character evidence. See *Cook v. State,* 255 Ga. 565, 584-585 (17) (g) (340 SE2d 843) (1986). Even assuming that

> trial counsel's decision not to call character witnesses on [Neal's] behalf [w]as ill-advised and based on an evaluation of the evidence which hindsight shows to be incorrect, we nevertheless regard that decision as being a matter of trial strategy, which, even if erroneous, does not itself constitute a denial of effective assistance of counsel. [Cits.]

*Johnson v. State,* 266 Ga. 380, 382 (2), fn. 3 (467 SE2d 542) (1996). *Judgment affirmed. All the Justices concur.*

HUNSTEIN, Chief Justice, concurring.

The Georgia Constitution of 1983 gives the Supreme Court appellate jurisdiction over "[a]ll cases in which a sentence of death was imposed or could be imposed." Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8). Because murder cases are a class of cases in which a sentence of death could be imposed, this provision gives this Court jurisdiction to decide direct appeals in life-imprisonment murder cases.

## Jurisdiction Over Capital Felonies

Throughout its history, the Georgia Supreme Court has had appellate jurisdiction to consider appeals in murder cases. As the sole appellate court from 1845 until 1906, this Court received all appeals from the superior courts. See *Dawson v. State,* 130 Ga. 127, 129-130 (60 SE 315) (1908). In 1906, the Court of Appeals was established by a constitutional amendment that also set out the jurisdiction of both courts. Among the cases assigned to the Supreme Court were "all cases of conviction of a capital felony." Ga. L. 1906, p. 24. The following year, this Court considered whether it had jurisdiction over

the appeal of a murder case when the accused was imprisoned for life, instead of being sentenced to death. See *Caesar v. State*, 127 Ga. 710 (1) (57 SE 66) (1907). In *Caesar*, the Court interpreted "capital felony" to mean felonies in which the death penalty may be affixed as a punishment, as distinguished from the class of felonies in which death can never be imposed under any circumstance. Id. at 712-713. Thus, the Court concluded that it had jurisdiction in every capital felony where the law provides for punishment by death as a penalty, whether or not the penalty is imposed in the specific case.

The language assigning capital felony convictions to the Supreme Court was carried forward unchanged in the Georgia Constitutions of 1945 and 1976. Ga. Const. of 1976, Art. VI, Sec. II, Par. IV ("in all cases of conviction of a capital felony"); Ga. Const. of 1945, Art. VI, Sec. II, Par. IV (same). Similarly, this Court continued to interpret the "conviction of a capital felony" language as conferring on the Supreme Court appellate jurisdiction over cases in which the accused was found guilty of a capital felony. See, e.g., *Mika v. State*, 196 Ga. 473 (2) (26 SE2d 616) (1943) (jurisdiction depends on whether there is a conviction of a capital felony and not on what punishment is actually imposed). See also *Dawson*, 130 Ga. at 132 (constitutional amendment gives the Supreme Court the "power of ultimate determination of jurisdictional questions between the two courts").

In 1977, this Court reexamined our jurisdiction over capital felonies after the Georgia General Assembly enacted a law affecting the jurisdiction of the state's two appellate courts. The act gave the Court of Appeals jurisdiction of appeals in cases involving armed robbery, rape, and kidnapping where the death penalty had not been imposed and the Supreme Court jurisdiction in cases involving state revenue, election contests, and the validity of municipal ordinances. Ga. L. 1977, p. 710, § 1. Inquiring into our own jurisdiction, we held that the legislative attempt to enlarge our jurisdiction by transferring certain appeals from the Court of Appeals to this Court was unconstitutional. *Collins v. State*, 239 Ga. 400 (1) (236 SE2d 759) (1977). To effectuate the act's legislative intent, we adopted an order under our inherent powers directing the Court of Appeals to transfer cases involving state revenues, election contests, and the constitutionality of municipal ordinances to the Supreme Court. See id. at 403.

On the issue of transfers to the Court of Appeals, this Court determined that the constitution permitted the change of appellate jurisdiction of armed robbery, rape, and kidnapping cases from our Court to the Court of Appeals. Citing our 1907 decision in *Caesar v. State*, we reaffirmed that the term "capital felony" applies to felonies to which the death penalty may be imposed under certain circum-

stances. *Collins*, 239 Ga. at 402. Since the death penalty could no longer be imposed for the crimes of armed robbery, rape, and kidnapping where the victim was not killed, we concluded that they were not capital felonies and the Court of Appeals had jurisdiction of appeals involving those crimes. Id. at 402-403. This ruling left unchanged our jurisdiction over all life-imprisonment murder cases, see id. at 404 (Jordan, J., concurring specially), since the crime of murder remained a felony to which the death penalty could be affixed as punishment under specific circumstances.

*Jurisdiction Over Cases in Which the Death Penalty Can Be Imposed*

Under the 1983 Constitution, the Supreme Court has general appellate jurisdiction of all cases in which a sentence of death "was imposed or could be imposed." Art. VI, Sec. VI, Par. III (8). Although the 1983 Constitution altered the language used to describe this Court's general appellate jurisdiction over murder cases, it did not change our jurisdiction to hear and decide appeals involving life-imprisonment murder convictions. The addition or modification of language in a constitution may create a presumption that the framers intended to change existing law, *Collins v. American Tel. &c. Co.*, 265 Ga. 37 (456 SE2d 50) (1995), but that presumption may be rebutted if the constitutional history does not support giving a new meaning to the provision. See *Grissom v. Gleason*, 262 Ga. 374 (2) (418 SE2d 27) (1992) (interpreting the equal protection clause).

When construing a constitutional provision, we must give words their ordinary meaning. The cardinal rule of construction is to ascertain the legislative intent, keeping in view the old law, the evil, and the remedy. OCGA § 1-3-1 (a). When the language is capable of more than one meaning, we construe the provision so as to carry out the legislative intent. *Judicial Council of Ga. v. Brown & Gallo, LLC*, 288 Ga. 294 (702 SE2d 894) (2010).

Both the could-be-imposed language and its constitutional history support interpreting our constitution as giving the Supreme Court jurisdiction over life-imprisonment murder cases. Our homicide statute provides that a "person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for life." OCGA § 16-5-1 (d) (2011). Under this law, murder is clearly a crime in which a defendant, upon conviction, can be punished by death as compared to other crimes, such as rape, where a sentence of death can never be imposed. See *Coker v. Georgia*, 433 U. S. 584 (97 SC 2861, 53 LE2d 982) (1977) (holding death penalty for rape can no longer be imposed under the Eighth Amendment when the victim is not killed). Thus, direct appeals of murder convictions are subject to the jurisdiction of the

Supreme Court under our State Constitution.

Moreover, the constitutional history of the 1983 Constitution makes clear that the framers intended for the division of jurisdiction between the two appellate courts to remain unchanged, with this Court continuing to hear all appeals from murder convictions, whether a sentence of death or life imprisonment is imposed. Initial drafts of the Judicial Article provided that the Supreme Court would have jurisdiction "in all cases imposing a sentence of death," thus giving the Court of Appeals jurisdiction over appeals in life-imprisonment murder cases. See Select Committee on Constitutional Review, Committee to Revise Article VI, Transcripts of Meetings, Oct. 7, 1977, pp. 52-54. The Article VI Committee voted to amend this initial draft to give this Court jurisdiction "in all cases in which a sentence of death has been imposed." Id. at 53. The rationale was that habeas corpus cases involving the death penalty should be treated in the same way as direct appeals in death penalty cases. While there were extended discussions about changing the structure of the appellate courts and restricting direct appeals to the Supreme Court, no committee members voiced any dissent to the proposition that the state's highest court should review cases in which the death penalty was imposed. See, e.g., Article VI Committee, Transcripts, Sept. 23, 1977, pp. 14, 62 (voting unanimously for the Supreme Court to retain direct appeals in cases where death penalty is imposed while recommending that its jurisdiction be primarily discretionary).

The same unanimity did not apply to appeals in other cases, such as non-death penalty murder cases. The members of the Court of Appeals consistently opposed the provision to redistribute life-imprisonment murder cases to their court, but failed in their motion that all life-sentence murder cases go to the Supreme Court. See Article VI Committee, Transcripts, Oct. 3, 1980, pp. 91-94. The Article VI Committee's final draft recommended that the Supreme Court exercise exclusive appellate jurisdiction in all "cases in which a sentence of death was imposed." Id., Index, Proposed Draft (Oct. 28, 1980), p. 4.

The Legislative Overview Committee, however, rejected the committee's recommendation. Select Committee on Constitutional Revision, Legislative Overview Committee, Transcript of Meetings, Aug. 7, 1981, p. 140. Instead, it substituted language from a draft proposed by House Speaker Tom Murphy that added "could be imposed" to give the Supreme Court jurisdiction in all murder cases in which a life sentence was imposed. Id. at 142. The intent was to "leave the jurisdiction of the two appellate courts substantially as it is now, or exactly." Id. at 143. Both the Chief Justice of the Supreme Court and the Chief Judge of the Court of Appeals agreed to leave the

jurisdiction of their courts unchanged, as the following excerpt shows.

> Chief Justice Jordan: What we wanted to do, Mr. Speaker, and the Chief Judge of the Court of Appeals is here, he and I tried to work it out so that the jurisdiction shall remain exactly as it is now.
>
> Chief Judge Quillian: Exactly.
> . . . .
> Speaker Murphy: I took their Number (1), Mr. Chief Justice, in all cases where the sentence of death was imposed, and I added "or could be imposed" . . . .
>
> Chief Justice Jordan: If the Overview Committee were to adopt the committee's report, then we would accept that. . . .
>
> Governor Busbee: Is there any objection in order to make it the same where we can expedite this just to take (1) of Paragraph II [on exclusive Supreme Court appellate jurisdiction] and make it Paragraph (8) in Paragraph III [on general appellate jurisdiction of Supreme Court], and that's the existing law; isn't that right, Judge Quillian?
>
> Chief Judge Quillian: That's right.
>
> Chief Justice Jordan: I have no objection.
>
> Governor Busbee: Both the Chief Justice and the Chief Judge agree.

Id. at 143-144. Subsequently, the General Assembly and voters approved the 1983 Constitution with the language that was intended to maintain the existing jurisdiction of the appellate courts.

The primary argument against interpreting the could-be-imposed language to include all murder cases is our decision in *State v. Thornton*, 253 Ga. 524 (1) (322 SE2d 711) (1984). In that case, the State appealed the grant of a motion to suppress in a murder case to the Court of Appeals, which transferred the case to this Court. We concluded that the case was not a case in which a sentence of death could be imposed because the district attorney did not give timely notice that the State intended to seek the death penalty. Nevertheless, as a matter of policy, we determined that this Court should review all murder cases and adopted an order directing the Court of Appeals "to transfer to the Supreme Court all cases in which either a sentence of death or of life imprisonment has been imposed upon conviction of murder, and all pre-conviction appeals in murder cases." Id. at 524.

As has been pointed out, "[f]or a case with such significant

consequences, *Thornton* provides little reasoning for its holdings." *State v. Murray*, 286 Ga. 258, 264 (687 SE2d 790) (2009) (Nahmias, J., dissenting). Neither *Thornton* nor any subsequent opinion reviewed the could-be-imposed provision's constitutional history as set out in the transcripts of committee meetings related to Article VI. Since *Thornton*, the justices who have considered the interpretation of the same constitutional language have expressed different views on what it means. Compare *Weatherbed v. State*, 271 Ga. 736, 741 (524 SE2d 452) (1999) (Benham, C. J., concurring specially) (the phrase " 'could be imposed' . . . speaks to the future and is applicable to those cases in which the possibility of the imposition of the death penalty still exists") with *State v. Murray*, 286 Ga. at 260 (Carley, P. J., concurring) (the language placing appellate jurisdiction in this Court over all cases in which a death sentence could be imposed "may be broad enough to include appeals in all murder cases").

Although the could-be-imposed language can be interpreted two ways, its constitutional history shows that the framers of the 1983 Constitution intended it to apply to all murder cases, whether the death penalty or life imprisonment was imposed. Relying on this intent, this Court should interpret our State Constitution as giving us jurisdiction over life-imprisonment murder convictions, thus making unnecessary the transfer order adopted in *Thornton*. Nevertheless, as Presiding Justice Carley has stated, the order "has provided a practical, bright-line rule which continues to serve both Georgia appellate courts well." *Murray*, 286 Ga. at 260 (Carley, P. J., concurring). For these reasons, I would overrule *Thornton* and *Rhyne v. State*, 264 Ga. 176 (442 SE2d 742) (1994), to the extent they hold that the 1983 Constitution gives the Court of Appeals jurisdiction over direct appeals in life-imprisonment murder convictions.

There are several good policy reasons for defining our jurisdiction more narrowly to limit the number of murder cases that come to this Court by direct appeal, as the discussion among the constitution's framers shows. See generally Article VI Committee, Transcripts, Sept. 23, 1977, pp. 7-71. Any efforts, however, to change our appellate jurisdiction in life-imprisonment murder cases under the 1983 Constitution should be directed to the legislature.

I am authorized to state that Presiding Justice Carley, Justice Benham, Justice Thompson, Justice Hines, Justice Melton, and Justice Nahmias join in this concurrence.

NAHMIAS, Justice, concurring.

Two years ago, I noted that this Court had never explained the *constitutional* basis of the order announced in Division 2 of *State v. Thornton*, 253 Ga. 524, 524 (322 SE2d 711) (1984), which directed, "[a]s a matter of policy" and without citation of any constitutional

authority, that appeals of all murder cases, and not only those involving the death penalty, must come to this Court rather than going first to the Court of Appeals. See *State v. Murray*, 286 Ga. 258, 264 (687 SE2d 790) (2009) (Nahmias, J., dissenting). The silence was remarkable, because *Thornton* had led our Court over the ensuing 25 years to decide literally thousands of non-death penalty murder appeals, which indeed are the single largest category of our published decisions.

In examining *Thornton*, I expressed doubt about the correctness of its holding in Division 1, which summarily concluded that only murder cases in which the District Attorney has actually sought the death penalty fall within this Court's jurisdiction over "cases in which a sentence of death was imposed or could be imposed," Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8). See *Murray*, 286 Ga. at 265, n. 9 (Nahmias, J., dissenting) (noting that the "language used in the 1983 Constitution may also be read to include all murder cases, and indeed the records of the Select Committee on Constitutional Revision, which drafted that language, provide considerable support for the view that it was intended to continue our direct appeal jurisdiction over murder cases") (emphasis omitted). However, perceiving no interest by the Court in reconsidering that holding, I looked for a constitutional basis to justify the order in Division 2 and concluded that it is "defensible" as a "categorical exercise of our longstanding and almost-unlimited certiorari jurisdiction." Id. at 266, 270. Notably, no Justice joined my opinion or identified any other constitutional authority by which this Court can decide all murder cases; we simply continued to do so.

The Court's silence finally has ended with Chief Justice Hunstein's concurring opinion in this case — the first opinion on this important jurisdictional issue to have the support of a majority of the Court's members. Chief Justice Hunstein explains why Division 1 of *Thornton* was decided incorrectly and should be overruled, along with the only case in which we have directly applied that holding, *Rhyne v. State*, 264 Ga. 176 (442 SE2d 742) (1994). I note that upon careful consideration, stare decisis does not weigh against this conclusion. See *State v. Jackson*, 287 Ga. 646, 657 (697 SE2d 757) (2010) (discussing factors to consider in determining whether to reexamine a prior erroneous ruling). The terse analysis in *Thornton* was unsound; the holding, while now 27 years old, has been applied to only one other case; and, importantly, any reliance interests that have developed around *Thornton*'s conclusion that this Court will decide all murder appeals are not affected by our ruling today, which has the same result — although now a result that rests on solid constitutional ground rather than unexplained "policy." For these reasons, I join Chief Justice Hunstein's concurring opinion in full.

DECIDED FEBRUARY 27, 2012.

*Roger C. Wilson*, for appellant.

*Paul L. Howard, Jr., District Attorney, Peggy R. Katz, Paige Reese Whitaker, Sheila E. Gallow, Assistant District Attorneys, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.